IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TONY ALEXANDER GILBREATH, §
§
*Plaintiff,* §
§
v. § CIVIL ACTION NO. H-06-2975
§
NATHANIEL QUARTERMAN, *et al.,* §
§
*Defendants.* §

## MEMORANDUM OPINION AND ORDER

Tony Alexander Gilbreath, a state inmate proceeding *pro se* and *in forma pauperis*, filed this section 1983 complaint against Texas Department of Criminal Justice ("TDCJ") employees Ed Owens, Nathaniel Quarterman, Pamela Williams, Steven Rich, Kevin Wheat, Sylvia Piasta, Bryan Buck, and John Cassidy (the "Original Defendants"). In an amended complaint, plaintiff named as additional defendants TDCJ employees Jerry Waldon, John Graham, J.T. Morgan, Daniel S. Olivarez, Tania Huerta, and Patrick Kessler (the "Amended Defendants").[1] The Original Defendants filed a motion for summary judgment (Docket Entry No. 46), to which plaintiff responded (Docket Entries No. 53-56). No service was ordered on the Amended Defendants.

---

[1]Plaintiff did not name Ed Owens in the amended complaint, and Owens no longer appears as a party defendant.

Based on the pleadings, the motion, the response, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment, **DISMISSES** plaintiff's claims against all of the defendants, and **DISMISSES** this lawsuit for the reasons that follow.

## I.   BACKGROUND AND CLAIMS

Plaintiff Gilbreath, a homosexual inmate, claims that the Original Defendants violated his Eighth Amendment rights by not classifying him for, and placing him in, safekeeping housing[2] at the Estelle Unit.  Plaintiff asserts that defendants instead housed him with another homosexual inmate, who sexually assaulted him on January 4, 2006.  He further sues defendant Williams as a member of the state classification committee for failure to approve a transfer or safekeeping housing, and asserts that Nathaniel Quarterman is responsible for all acts or omissions of the TDCJ employees.  He asserts that the Amended Defendants failed to follow established post-assault notification procedures, which delayed his post-assault medical examination.

Plaintiff sues defendants in their official and individual capacities for a declaratory judgment, compensatory and punitive damages, and an injunction ordering his transfer to another medical unit[3] with permanent placement in safekeeping housing.  (Docket Entry No.

---

[2]The Fifth Circuit has explained that "safekeeping is a housing status that separates vulnerable individuals from more aggressive offenders."  *Johnson v. Johnson*, 385 F.3d 503, 512 (5th Cir. 2004).

[3]Plaintiff states that he must remain at a designated medical unit because he is HIV-positive.

41.) Defendants assert entitlement to qualified immunity from plaintiff's monetary claims against them in their individual capacity, Eleventh Amendment immunity for plaintiff's monetary claims brought against them in their official capacity, and argue that plaintiff's Eighth Amendment, conspiracy, and injunctive relief claims fail as a matter of law.

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C).  A factual dispute will preclude a grant of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court may not weigh the evidence or make credibility determinations. *Id.*  Conclusory allegations, speculation, improbable inferences, or a mere scintilla of evidence, however, are insufficient to defeat a summary judgment motion. *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 754-55 (5th Cir. 2000).

The movant's initial burden is to demonstrate that no genuine issue of material fact exists. *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005).  If the movant satisfies that initial burden by establishing the absence of evidence to support an essential element of the non-movant's case, the burden shifts to the party opponent to establish that there is a genuine issue of material fact. *Id.*  An issue is "genuine" if the evidence is

3

sufficient for a reasonable jury to return a verdict for the nonmoving party. *Hamilton v.*

*Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam). A fact is "material"

if its resolution in favor of one party might affect the outcome of the lawsuit under governing

law. *Id.* The Supreme Court has held that facts must be viewed in the light most favorable

to the nonmoving party at the summary judgment stage only if there is a genuine dispute as

to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  FACTUAL ANALYSIS

Plaintiff is a homosexual inmate who has been in state custody for the past nineteen

years. He states that for six years of those years (1994 to 2000), he was classified for

safekeeping housing because of his homosexuality. (Docket Entry No. 53, p. 2.) On

December 19, 2005, he was transferred from the Stiles Unit to the Estelle Unit following an

enemy assault incident. *Id.* Upon plaintiff's arrival, the Estelle Unit Classification

Committee ("UCC") and State Classification Committee ("SCC") reviewed his housing

situation and placed him in general population housing due to lack of available beds in

safekeeping housing.[4] (Docket Entry No. 46, Exhibit A, p. 3.)

---

[4]A UCC consists of three voting members, who review and make recommendations regarding an inmate's custodial classification while at the unit. A recommendation to change an inmate's classification requires a majority vote. The UCC may recommend a housing change, placement in safekeeping, placement in protective custody, or a unit transfer. The SCC must approve the UCC's recommendations regarding safekeeping, protective custody, and unit transfers. Even in the face of a SCC denial, prison officials with the rank of Major have the power to assign inmates to transient housing or move them to safer parts of the unit. *See Moore v. Lightfoot*, 286 F. App'x 844, 2008 WL 2570694 (5th Cir. 2008) (not selected for publication).

4

Dissatisfied with this classification decision, plaintiff filed a step 1 grievance asking to be classified for safekeeping housing and/or transferred back to the Stiles Unit for protection and safety. (Docket Entry No. 53, p. 2.) Defendant Buck investigated plaintiff's step 1 grievance, and reported as follows:

> Offender claims he needs safekeeping due to being a homosexual. Offender was asked who he was in fear from on this unit, [and] he responded [that] no one has threatened him since his arrival. I referred the offender to contact medical for his medical issues. As for the issue of requesting [protective] custody I can find no evidence to support his request.

(Docket Entry No. 46, Exhibit B, p. 143.) Plaintiff's grievance for safekeeping status was denied by the UCC on December 27, 2005, because plaintiff had experienced no threats or problems at the Estelle Unit and defendant Buck could find no corroborating evidence to support the status change. *Id.*, Exhibit A, p. 2; Exhibit B, pp. 141-43.

On January 4, 2006, offender Terry Windom, also a homosexual inmate, was assigned as plaintiff's cell mate at the Estelle Unit. *Id.*, Exhibit B, p. 106. Defendant Cassidy was conducting scheduled cell moves on that day when he was called to plaintiff's cell. *Id.*, p. 131. According to Cassidy's incident report,

> I was on my way off the wing when Offender [plaintiff] called me over to D1-206. At this time the offender stated to me that he was assigned to bottom bunk and he was moved to D1-206 top bunk and that the other offender had the bottom bunk. I then told the offender that I would check with medical and see if he [had] a bottom bunk pass. The reason that he was moved [was] to house offenders that were of the same custody, age, height, and weight to make room for the incoming chain. And if he did not have a bottom bunk pass [then] he would have to remain in the cell that he was assigned. But if he did have a bottom bunk pass I would get him moved. After checking with [staff]

in the medical department and [finding] out that the offender had not had a
bottom bunk pass since 10-10-05, I returned to the wing and informed the
offender that he would have to remain in the cell assigned to the top bunk.
And at no time did [plaintiff] state to me that he was having problems with his
cell mate.  Nor did the other offender state that he was having trouble with
[plaintiff].  I then left the wing with the understanding that both offenders
understood who had the top bunk and the bottom bunk.  At no time was I ever
called back to the wing to talk to either offender about having problems with
each other.  The first I heard about [plaintiff] being raped by his cellie wa[s]
by Lieutenant Cook on 01-05-06.

(Docket Entry No. 46, Exhibit B, p. 131.)

Plaintiff, however, disagrees with Cassidy's statements, and asserts that, upon

Windom's arrival, he called Cassidy over to his cell, told him he was supposed to have a

bottom bunk restriction, and complained that Cassidy "was moving an offender into

plaintiff's cell that plaintiff could not live with."  (Docket Entry No. 53, p. 3.)  In his

grievance filed after the ensuing assault, plaintiff stated that,

On 1/4/06 offender Terry Windom #679968 moved into the cell (D1-206) with
me and we both informed Sgt. Cassidy we had problems living with each other
because we had gotten into it verbally on the [recreation] yard because he had
tried to come on to me and I went off on him.  Sgt. Cassidy stated he didn't
think either one of us wanted to [risk] our medium custody level [over] a bunk
or cellmate.  So we agreed to stay together and work things out.

(Docket Entry No. 46, Exhibit B, p. 148.)  Plaintiff stated that, later that same evening, he

took a large dose of sinus medication to help him go to sleep, but woke up around 10:30 p.m.

when Windom sexually assaulted him.

Plaintiff reported the offense and an investigation was undertaken.  Plaintiff was

moved to solitary confinement after the assault pending outcome of the investigation, and

6

Windom was transferred to another unit. Plaintiff renewed his request for a transfer or reassignment to permanent safekeeping housing on January 9, 2006, but the request was denied because plaintiff was HIV-positive and needed to remain at a medical unit. Plaintiff states that, although defendant Rich recommended his transfer to another unit, the UCC elected instead to keep plaintiff at the Estelle Unit and transfer Windom. (Docket Entry No. 53, p. 4.) Plaintiff further states that Rich denied his post-assault request for safekeeping housing, and told plaintiff that homosexual inmates were not housed in safekeeping at the Estelle Unit. *Id.* The record shows that plaintiff has remained housed at the Estelle Unit since the filing of this lawsuit.

## IV. LEGAL ANALYSIS

### A. Eleventh Amendment Immunity

Defendants move for summary judgment on plaintiff's claims against them in their official capacity on grounds that they are immune from such relief under the Eleventh Amendment. Plaintiff's claims for monetary damages against all of the defendants in their official capacities as TDCJ employees are barred by the Eleventh Amendment, and these claims are dismissed. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

### B. Vicarious Liability

In naming TDCJ Director Nathaniel Quarterman as a defendant, plaintiff asserts that he "is fully responsible for all unlawfully committed actions by all defendants who is (sic)

named herein." (Docket Entry No. 41, p. 10.) Further, plaintiff sues Senior Warden Morgan because he "is solely responsible for the actions of his subordinates by failing to properly maintain the supervisory control of their decisions and actions that reflect the lack of training, supervision, direction, and/or control of their (sic) employees." *Id.*, pp. 13-14. Plaintiff asserts no facts establishing the personal involvement of either Quarterman or Morgan in the events giving rise to this lawsuit.

It is well established that section 1983 does not create vicarious or *respondeat superior* liability. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003). Plaintiff's claims against Quarterman, Morgan, or any other defendant for vicarious or *respondeat superior* liability are dismissed for failure to state a claim. As plaintiff also establishes no personal involvement on the part of these defendants, his claims against them in their individual capacity are dismissed.

C.   Failure to Protect

Plaintiff claims that the Original Defendants[5] violated his Eighth Amendment rights by failing to protect him from the sexual assault. The Supreme Court formally recognized and described the Eighth Amendment failure to protect theory in *Farmer v. Brennan*:

---

[5]These defendants include Williams as a SCC member; Rich as Assistant Warden; Wheat as Head Major; Piasta as UCC chief; Buck as building captain; and Cassidy as Building Sergeant. Plaintiff also states that Wheat, Piasta, Rich, and Buck were members of the Estelle Unit UCC at the time of these events. (Docket Entry No. 41.)

> [P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners . . . . [G]ratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e], any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

511 U.S. 825, 833-34 (1994) (citations and internal quotation marks omitted). The Court went on to explain that, to succeed on a failure to protect claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison officials acted with "deliberate indifference" to the inmate's safety. *Id.* at 834.

An official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The official's knowledge of the risk can be proven through circumstantial evidence, such as by showing that the risk was so obvious that the official must have known about it. *Id.* at 842. However, there is no liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. *Campbell v. Fox*, 253 F. App'x 348, 349 (5th Cir. 2007) (not selected for publication) (affirming district court's dismissal as frivolous prisoner's claim that he was physically and sexually assaulted due to defendants' failure to protect him); *see also Mourad v. Fleming*, 180 F. App'x 523, 524 (5th Cir. 2006) (not selected for publication).

It is well-settled "that all prison inmates are entitled to reasonable protection from sexual assault." *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004).

D.    Qualified Immunity

Defendants contend that they are entitled to qualified immunity from plaintiff's failure to protect claims for monetary damages against them in their individual capacity.

The liability of prison officials to an inmate harmed by another inmate rests not with the fact of the harm, but with the reasonableness of the officials' response to the risk of such harm. As noted by the Fifth Circuit, even "[t]he most diligent prison administrators cannot guarantee complete safety." *Johnson*, 385 F.3d at 526. Defendants are entitled to qualified immunity unless their conduct violated clearly established law such that their behavior was objectively unreasonable. To be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The law can be clearly established even without prior cases that are on all fours with the present case, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights. *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).

Determining whether an official is entitled to qualified immunity is a two-step process. *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). First, a court must determine "whether the plaintiff has alleged the violation of a clearly established federal constitutional (or federal statutory) right." *Id.* If so, the second step requires the court to

10

"assess whether the defendant's conduct was objectively reasonable in light of clearly established law." *Id.* "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiry concerning qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the allegations establish a constitutional violation, the court then considers whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Hope*, 536 U.S. at 739. A right is clear if a reasonable officer would know that his conduct violates that right. *Id.* "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citation omitted). When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002).

The Supreme Court has recently modified *Saucier* with respect to these two sequential steps for determining qualified immunity. In *Pearson v. Callahan*, 555 U.S. __, __, 129 S. Ct. 808, 818 (2009), the Court held that the sequencing of these two steps is no longer mandatory. The Court held that "experience supports our present determination that a

mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Id.* at 817. The Court went on to hold that, "while the sequence set forth in [*Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. The Court noted that the *Saucier* procedure sometimes unnecessarily "results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Id.* at 818. Thus, *Pearson* allows a court to resolve a party's entitlement to qualified immunity without first determining whether there was an actual deprivation of a constitutional right.

In raising a two-fold Eighth Amendment failure to protect claim against the Original Defendants, plaintiff asserts that (1) they failed to house him in safekeeping, and that (2) they housed him with a known violent and assaultive homosexual inmate.

A prison official is deliberately indifferent if he knows of and disregards an excessive risk to inmate health or safety; that is, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer*, 511 U.S. at 837. However, a prison officer may avoid liability if he responded reasonably to the risk, even if the harm ultimately was not averted. *Id.* at 844. Courts must employ a subjective standard, as opposed to an objective standard, in determining whether a prison official acted with deliberate indifference. *Id.* at 842-43.

12

Actions by prison officials that are "merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Hernandez v. Tex. Dep't of Protective and Regulatory Serv.*, 380 F.3d 872, 883 (5th Cir. 2004).

Plaintiff complains that, by failing to house him in safekeeping upon his arrival at Estelle Unit, the Original Defendants were deliberately indifferent to his safety in violation of the Eighth Amendment. By this argument, plaintiff complains not that he was housed with any particular inmate, but that he was not classified for, and housed in, safekeeping. In applying *Pearson*, this Court looks to *how* the defendants responded to any risk of harm arising from plaintiff's not being housed in safekeeping.

The record shows that plaintiff was transferred from the Stiles Unit to the Estelle Unit in December 2005 due to an enemy-assault at the Stiles Unit. Upon plaintiff's arrival at the Estelle Unit, the UCC and SCC reviewed his classification and housing status. Defendants state that plaintiff initially was placed in general population because there was no additional space in safekeeping. (Docket Entry No. 46, p. 4.)

Plaintiff immediately filed a grievance disputing his placement in general population, and stated that he needed safekeeping due to his homosexuality. As part of his investigation of the grievance, defendant Cassidy asked plaintiff for further details; plaintiff responded that no one had threatened him at the Estelle Unit. Cassidy concluded in his investigation report that, "As for the issue of requesting [protective] custody I can find no evidence to support

13

his request." *Id.*, Exhibit B, p. 143. The UCC determined that safekeeping housing was not indicated, as plaintiff had experienced no threats or problems at the unit and the investigation had revealed no corroborating evidence for safekeeping. *Id.*, Exhibit A, p. 2; Exhibit B, pp. 141-43. The UCC further evaluated plaintiff's request for safekeeping housing and determined that the immediate threats to his safety at the Stiles Unit had been resolved by his transfer to the Estelle Unit. Accordingly, defendants acted reasonably in not immediately placing plaintiff in safekeeping upon his arrival at the Estelle Unit. *See Longoria*, 473 F.3d 586, 594 ("[R]esponding to an inmate's complaints by referring the matter for further investigation or taking other appropriate administrative action fulfils an official's protective duties under the Eighth Amendment.") (internal quotation marks omitted). Defendants also acted reasonably in assigning another homosexual inmate as plaintiff's cell mate ( as opposed to a heterosexual inmate) in order to reduce the risk of harm to plaintiff from heterosexual inmates in the general population. *See Johnson*, 385 F.3d at 526 ("Certain UCCs responded to Johnson's claims by taking actions such as ordering further investigation or separating Johnson from a particular inmate who had been threatening him. Those responses were unavailing, but they well may have been reasonable methods of addressing the risk that Johnson faced."). The SCC in the instant case ultimately and reasonably elected to remove the risk presented by Windom's presence by transferring him to another unit.

The fact that plaintiff was assaulted by Windom does not prove that defendants' responsive actions were unreasonable. Plaintiff cannot rely on the fact of his assault as

14

proving that defendants responded unreasonably to any risk of serious harm presented by his homosexuality. *See Farmer*, 511 U.S. at 544 (holding that there is no liability if the official responded reasonably to the risk, even if the harm ultimately was not averted). Plaintiff raises no genuine issue of material fact that defendants knew that his placement in general population posed a substantial risk of serious harm to him, and he presents no competent summary judgment evidence that any defendant had subjective knowledge of any threat to plaintiff at the Estelle Unit prior to the assault. Even if the Court were to assume that defendants knew of a substantial risk to plaintiff, he raises no genuine issue of material fact as to whether they responded unreasonably to that risk. *See Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) ("Even assuming that all of the defendants knew of the substantial risk to Johnson's safety, there would be no Eighth Amendment violation if the undisputed facts in the record demonstrated that they responded reasonably."). *See also Moore v. Lightfoot*, 286 F. App'x 844 (5th Cir. 2008) (not selected for publication)

Plaintiff's specific claims against Williams based on her alleged status as chief of the SCC fail, as he establishes no personal involvement on her part that caused him harm. Plaintiff does not show that she voted against his transfer from the Estelle Unit or his classification for safekeeping, nor does he show that she was a policymaker for any policy that precluded his transfer or placement in safekeeping. Moreover, both the UCC and the SCC voted to transfer Windom to another unit away from plaintiff, thus reasonably responding to any risk to plaintiff created by Windom's presence on the unit. To the extent

15

plaintiff complains that Williams misled or ignored his family, his complaints raise no issue of a constitutional dimension.

In addition to his complaints regarding denial of safekeeping, plaintiff also claims that defendants responded unreasonably to a risk of serious harm by housing him with Windom. In support, plaintiff avers that "although [defendants] knew I needed to be protected, they housed me with a prisoner who was known to be ass[au]ltive. That the prisoner with whom they housed me was known to be ass[au]ltive and he ass[au]lted me." (Docket Entry No. 56, p. 1.) By this claim, plaintiff asserts that defendants knew he was vulnerable yet they responded unreasonably by housing him with a known violent and assaultive offender. The record, however, is devoid of any probative summary judgment establishing that, at the time defendants assigned Windom as plaintiff's cell mate, Windom was violent and assaultive and that defendants knew he was violent and assaultive. That Windom subsequently assaulted plaintiff does not constitute evidence or proof that defendants knew Windom to be violent and assaultive.

Plaintiff further points to his allegations that, on the morning of the assault, both he and Windom complained to Cassidy that they did not want to be housed together. According to plaintiff, Windom had "come on to him" on the recreational yard and plaintiff had turned him down. Although plaintiff and Windom agreed that they did not want to be cell mates, neither of them expressed any safety concerns to Cassidy regarding the cell assignment. Significantly, plaintiff did not indicate that he feared Windom or had been threatened by him.

16

Cassidy told them to "work out your differences as best you can," and plaintiff admits that they agreed, albeit reluctantly, to remain cell mates. (Docket Entries No. 41, p. 8; No. 53, p. 3.) Cassidy later stated that, after resolving the top bunk/bottom bunk issue for plaintiff and Windom, "[a]t no time was I ever called back to the wing to talk to either offender about having problems with each other." (Docket Entry No. 46, Exhibit B, p. 131.) This lack of a safety concern is echoed in plaintiff's admission that he took several doses of cold medicine to help him fall asleep that evening, which strongly suggests he had no fear of Windom, or believed him to constitute a threat to his personal safety, prior to the assault. No competent summary judgment appears in the record demonstrating that anyone, including plaintiff himself, knew that Windom posed a substantial risk of harm to plaintiff.

The competent summary judgment evidence does not support a conclusion that defendants' conduct was objectively unreasonable in light of the legal rules that were clearly established at the time of their actions, and plaintiff raises no genuine issue of material fact precluding defendants' entitlement to qualified immunity. Neither the Supreme Court nor the Fifth Circuit Court of Appeals has construed the Eighth Amendment as mandating that prison officials provide safekeeping housing to homosexual inmates . *See Johnson*, 385 F.3d at 526 ("Given that neither the Supreme Court nor this court has delineated the contours of what supervisory officials must do on pain of personal liability, their conduct did not violate clearly established law of which reasonable officers should have known. Therefore, they are entitled to qualified immunity."). While it is clear that prison officials have an Eighth

17

Amendment duty to protect reasonably all inmates from harm by other inmates, consigning homosexual inmates to safekeeping is neither the constitutionally-mandated nor sole manner in which that duty may be discharged.

Defendants are entitled to qualified immunity on plaintiff's Eighth Amendment claims against them for monetary damages, and summary judgment is granted dismissing these claims.

E.      Conspiracy

Plaintiff argues that the Original Defendants conspired to deny him safekeeping after the attack of January 4, 2006. A plaintiff alleging conspiracy under section 1983 must allege and prove facts showing an agreement to commit an illegal act. *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982). As discussed elsewhere in this memorandum opinion, plaintiff has not established a constitutional violation on which to base a section 1983 conspiracy claim. *See Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir. 1984) (requiring actual deprivation of constitutional right for conspiracy claim under section 1983).

Further, to successfully pursue a claim of conspiracy to deprive a plaintiff of his constitutional rights under 42 U.S.C. § 1985(3), a plaintiff must allege and prove (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or deprivation of any right or privilege of a citizen of the United States. *Hilliard v. Ferguson,* 30 F.3d 649

(5th Cir. 1994). Where all of the defendants are members of the same collective entity, the conspiracy does not involve two or more people. *Id.* at 653. Because all of the defendants in the instant case are employees of the same collective entity, no cause of action for conspiracy is presented.

Regardless, plaintiff presents no arguments or probative summary judgment regarding this claim in his opposition to the motion for summary judgment, and fails to raise a genuine issue of material fact precluding summary judgment. Plaintiff's conspiracy claim is dismissed as to all of the defendants.

F.      Failure to Follow Post-Assault Notification Procedures

Plaintiff asserts that after the assault and his placement in a different cell, Amended Defendants Waldon, Graham, Huerta, and Kessler failed to follow proper procedures for notifying supervisory officials of the assault and of his relocation to the new cell. Violations of prison procedures, standing alone, do not constitute issues of constitutional dimension. *Samford v. Dretke*, 562 F.3d 674, 681 (5th Cir. 2009). Moreover, because these failures to follow proper notification procedures occurred after the assault, they form no basis for plaintiff's Eighth Amendment failure to protect claims. His allegations fail to state a claim and are dismissed.

Plaintiff also complains that, because these defendants failed to follow post-assault notification procedures, medical staff and the SANE-RN (sexual assault nurse examiner) were not called to examine plaintiff and obtain forensic evidence until after the shift change.

19

The record shows that plaintiff was examined by a medical care provider and the SANE-RN on January 5, 2006; the medical examiner's chart note reflects that forensic evidence was obtained, a full physical examination was performed with no physical trauma observed, and plaintiff was referred to mental health providers and scheduled for a one-week follow-up. (Docket Entry No. 46, Exhibit B, p. 116.)

Because plaintiff neither alleges nor presents probative summary judgment evidence that he was physically harmed by the delay, his claim regarding the delayed medical examination is dismissed. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993) (holding that a delay in medical care constitutes an Eighth Amendment violation only if there has been deliberate indifference which resulted in substantial physical harm).

G.    Injunctive Relief

Plaintiff requests injunctive relief against the Original Defendants in the form of an order directing TDCJ officials to house him in safekeeping for the duration of his life sentence. Defendants are not entitled to dismissal of this claim based on qualified immunity, as qualified immunity does not protect them from requests for injunctive relief. *See Williams v. Ballard*, 466 F.3d 330, 334 (5th Cir. 2006); *Orellana v. Kyle*, 65 F.3d 29, 33 (5th Cir. 1995). Accordingly, the Court must consider whether defendants are entitled to summary judgment dismissing plaintiff's request for injunctive relief.

To prevail on his claim, plaintiff must prove a deprivation of his constitutional rights pursuant to an official state policy in order to obtain injunctive relief from the state or state

employees acting in their official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985); *Grandstaff v. City of Borger*, 767 F.2d 161, 169 (5th Cir. 1985). Thus, in considering whether denial of safekeeping pursuant to a state policy violated plaintiff's right to be free from cruel and unusual punishment, the Court must first determine whether plaintiff has established a constitutional violation.

The Eighth Amendment's prohibition against cruel and unusual punishment forbids deliberate indifference to the health and safety of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The plaintiff must prove objectively that he was exposed to a substantial risk of serious harm, and that prison officials acted or failed to act with deliberate indifference to that risk. *Farmer*, 511 U.S. at 834. The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the prison officials were actually aware of the risk, yet consciously disregarded it. *Id.* at 837, 839.

Plaintiff complains that defendants continued to deny his requests for safekeeping housing following the assault. After the assault, plaintiff filed a life endangerment request for safekeeping. (Docket Entry No. 46, Exhibit B, p. 147.) The UCC, SCC, and Office of the Inspector General ("OIG") received copies of the life endangerment request, and the OIG launched a criminal sexual assault investigation into the incident. *Id*. The UCC and SCC transferred Windom to another unit and added his name to plaintiff's prison "enemy list," but denied plaintiff's request for his own transfer.

21

In support of his claim, plaintiff states in his affidavit that, "The defendants each had personal knowledge that I had a serious safety need in that I needed to be protected from sexual assaults." (Docket Entry No. 56, p. 1.)  He further asserts that, "Each of the defendants were deliberately indifferent to my serious safety needs because although they knew I needed to be protected they housed me with a prisoner who was known to be ass[au]ltive.  That the prisoner with whom they housed me was known to be ass[au]ltive and he ass[au]lted me." *Id.*  Plaintiff directs the Court's attention to the fact that, because he had been in protective custody at the Stiles Unit from 1994 to 2000 due to gang-related problems and his sexual orientation, his need for protection was "well known." (Docket Entry No. 53, p. 2.)  It is plaintiff's position that he is entitled to permanent safekeeping housing due to his sexual orientation.

The Court's careful review of the record fails to evince competent summary judgment evidence that any of the defendants drew an inference that his or her actions exposed plaintiff to a substantial risk of serious harm.  Plaintiff's request for safekeeping housing was promptly investigated, and the investigation found that safekeeping was unnecessary.  Moreover, not even plaintiff himself knew or expressed concern that Windom posed a substantial risk of harm to his safety, particularly as to a risk of sexual assault.  No deliberate indifference, and hence no constitutional violation, appears in the record before this Court.  Even assuming proof of a constitutional violation, plaintiff does not identify a specific state

policy the application of which gave rise to the violation.   Plaintiff is not entitled to permanent injunctive relief under the facts and law of this case.

The Court reaches this decision with reluctance and regret.   In no respect does this decision seek to diminish the physical or emotional hurt that plaintiff has had to endure.   This Court's solemn oath, however, is to apply and enforce the law of this land, irrespective of the Court's own concept of what the law ought to be.   In this instance, binding precedent admits of no alternative to the result that is reached.

## V.  CONCLUSION

For the above reasons, the Court **GRANTS** the motion for summary judgment, **DISMISSES** plaintiff's claims against all of the defendants, and **ORDERS** this lawsuit **DISMISSED WITH PREJUDICE**.   Any and all pending motions are **DENIED AS MOOT**.

The Clerk will provide copies of this order to the parties.

Signed at Houston, Texas, on this the 30th day of September, 2009.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE